PQ CORPORATION,

      Plaintiff,

    v.

LEXINGTON INSURANCE COMPANY,

      Defendant.

No. 13 CV 3482

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

PQ Corporation stored certain of its products at the Double D warehouse in Illinois. The products at the warehouse were allegedly damaged during storage, so Double D filed a notice of loss with its insurer, Lexington Insurance Company. Lexington denied coverage, and PQ (acting as Double D's assignee) sued for a declaration of coverage, breach of contract, and compensation under Section 155 of the Illinois Insurance Code. PQ and Lexington each moved for summary judgment. For the reasons discussed below, Lexington's motion is granted, and PQ's cross-motion is denied.

## I. Legal Standard

Summary judgment must be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing cross-motions for summary judgment, a court construes all facts, and draws all reasonable inferences from those facts, in favor of the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)).

## II.   Facts[1]

PQ Corporation, a Pennsylvania company, stored some of its sodium-silicate products at the Double D warehouse in Peru, Illinois. *See* [99] at 5 ¶ 11; [101-1] at 1–2 ¶¶ 1–2, 4.[2] In August 2011, some of PQ's customers began complaining to PQ about discoloration in its silicate powders. *See* [99] at 8 ¶ 19; January 9, 2015 Deposition of David James Smith, [96-11] at 2, Tr. at 10:6–:10; *id.* at 4, Tr. at 12:4–:10. Individuals at PQ looked into the company's manufacturing process, but could find no indication that the discoloration had originated at the plant. *See* Smith Deposition, [96-11] at 3, Tr. at 11:10–:23. Believing that the problem had instead originated at Double D's warehouse—specifically, from the storage nearby of phenol-formaldehyde resins, whose gases PQ suspected were reacting with the silicate powders—PQ sent to Double D on October 13, 2011, notice of a potential claim for damages. *See* [99] at 9 ¶ 22; [101-1] at 2 ¶ 5; *see also* October 13, 2011

---

[1] Each of the parties has in certain instances objected to the form of the other's Local Rule 56.1 statements. I have considered these objections, and rely only on the undisputed admissible facts (or those considered undisputed because they were not properly controverted as required by local rule).

[2] Bracketed numbers refer to entries on the district court's docket; referenced page numbers are from the CM/ECF header placed at the top of filings.

Letter and E-mail from Joseph Pellis to Steve Olsen, [97-3] at 2–4. Double D's insurance agent forwarded PQ's notice, along with Double D's own notice of a potential claim, to Lexington Insurance Company (Double D's insurer) on October 14. *See* [99] at 1 ¶ 1; *id.* at 9 ¶ 22; [101-1] at 2 ¶ 6; *id.* at 8 ¶ 29; *id.* at 16 ¶¶ 52–53; *see also* [97-4].

Lexington had issued to Double D a series of insurance policies, including one effective from June 2010 to June 2011, and another effective from June 2011 to June 2012. *See* [99] at 1 ¶ 1; [101-1] at 16 ¶¶ 52–53; *see also* [96-2] at 3, 36. The policies were identical in substance, *see* [101-1] at 16 ¶ 54, and each required Lexington to "pay all sums [Double D became] legally obligated to pay for direct physical 'loss' or damage to [the] personal property of others because of [Double D's] liability as a warehouse operator," [96-2] at 6 (2010–2011 Policy). ("Loss" was defined as "accidental, external, direct physical destruction, theft or damage to [the] personal property of others." *Id.* at 15.)

After receiving Double D's notice of loss, Lexington retained an independent claims adjuster to investigate the claim. *See* [101-1] at 8 ¶¶ 29–31. The claims adjuster contacted Double D's owner, Steve Olsen, to discuss the issue, and to request copies of any agreements between Double D and PQ. *See* [101-1] at 5 ¶ 18; *id.* at 8 ¶ 31. Olsen responded that Double D did not have any agreements with PQ. *See id.* at 9 ¶ 32; May 30, 2014 Deposition of Joseph Kucharz, [97-10] at 36, Tr. at 131:8–:15. The claims adjuster also contacted PQ's attorney, who provided in June 2012 a letter explaining PQ's theory of what had happened, and documentation

purportedly supporting that theory. *See* [99] at 10 ¶ 24; [101-1] at 11–12 ¶ 39; *see also* June 29, 2012 Letter from Joseph Pellis to Joe Kucharz, [97-27]. In the meantime, a scientific expert engaged by the claims adjuster visited the Double D warehouse and performed an inspection there in November 2011. *See* [99] at 16 ¶ 38; [101-1] at 9 ¶ 33.

In January 2013, Lexington advised Double D of the insurance company's conclusion that PQ's claim (against Double D) was not covered under the first of the two insurance policies—*i.e.*, the policy effective from June 2010 to June 2011. *See* [99] at 10–11 ¶ 25; [101-1] at 12 ¶ 40; *see also* Letter from Ross Chapman to Steve Olsen, [96-21] at 2. (Double D's original notice of loss had stated that the loss occurred in April 2011. *See* [101-1] at 2 ¶ 6; *see also* [97-4] at 4.) The January 2013 letter explained two reasons for denying coverage. First, said Lexington, the damage to PQ's goods was excluded under Section II of the policy. Section II excluded from coverage losses or damage to others' property, held by Double D, if Double D did not:

    A.    obtain a signed warehouse receipt from the customer at the time the customer deposited [its] personal property with [Double D], or

    B.    obtain a signed storage agreement from the customer covering the personal property, or

    C.    present a "rate quotation" prior to receiving the personal property.

[96-2] at 7 (Section II.4) (internal quotation marks omitted). The policy defined "rate quotation" as "a quotation by [Double D] that includes a loss limitation that [was] acknowledged and accepted by the customer through the transferring of [its]

product to [Double D's] care, custody or control." *Id.* at 15 (internal quotation marks omitted). The policy did not define "warehouse receipt" or "storage agreement." *See id.* at 15–16. Because neither Double D nor PQ had provided to Lexington proof of what Lexington considered to be a warehouse receipt, signed storage agreement, or rate quotation, Lexington concluded that the policy did not cover the damage to PQ's property. *See* Chapman Letter, [96-21] at 2–3.

Second, even if PQ's goods were covered under Section II, Lexington had determined that coverage was otherwise abrogated by the Pollution and Contamination Exclusion, which provided:

> Th[e] policy does not cover loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by th[e] policy.

[96-2] at 18 (Pollution, Contamination, Debris Removal Exclusion Endorsement). The exclusion defined "CONTAMINANTS or POLLUTANTS" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder." *Id.* This endorsement, wrote Lexington, excluded from coverage any damage to PQ's products from phenol vapors. *See* Chapman Letter, [96-21] at 3. Lexington later denied coverage under the second insurance policy—*i.e.*, the one

effective from June 2011 to June 2012—for the same reasons. *See* [99] at 10–11 ¶ 25; *see also* Letter from Ross Chapman to Kevin Phillips, [96-22].

In June 2013, PQ and Double D entered a "covenant not to execute," in which PQ agreed not to execute any judgment obtained against Double D for the damage to PQ's silicate products. *See* [97-30] at 2, 4–5. In exchange for PQ's promise not to execute, Double D agreed to assign to PQ all of Double D's related claims and rights against its insurer, and to file in Illinois state court a Stipulation for Consent Judgment, which ascribed to Double D "one hundred percent . . . of the fault for PQ's damages." *Id.* at 4, 7. PQ sued Double D in the Circuit Court of LaSalle County in July 2013, *see* [99] at 11–12 ¶ 27; [101-1] at 12 ¶ 41, and on August 21, 2013, the parties filed, and the circuit court entered, the Consent Judgment, [99] at 12 ¶ 28; [101-1] at 13–14 ¶ 46; [96-23].

Double D, meanwhile, had sued Lexington (also in state court) for a wrongful denial of coverage in the PQ matter. *See* [1-1]. Following the assignment to PQ of Double D's claims against the insurance company, PQ sought and was granted leave by the District Court for the Northern District of Illinois—to which the case had since been removed, *see* [1]—to file an amended complaint as plaintiff, *see* [15]; [18]; [24]. In its (second) amended complaint against Lexington, PQ included claims for: a judgment declaring PQ's products to be covered under the insurance policy (Count I); breach of Lexington's contracts with Double D (Count II); and unreasonable and vexatious conduct in violation of Section 155 of the Illinois

Insurance Code (Count III). *See* [66] at 12–21. Both parties move for summary judgment on all claims. [94]; [96].

## III.  Analysis

### A.  Breach of Contract and Declaratory Judgment

The parties agree that Illinois law governs construction of Double D's insurance policy with Lexington. *See* [95] at 5; [96] at 4. Illinois courts interpret insurance policies to "give effect to the intention of the parties." *Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 421 (7th Cir. 2016) (quoting *Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill.2d 381, 830 N.E.2d 575, 582 (2005)). Undefined terms are given their plain and ordinary meaning, *see id.*; ambiguous provisions are construed against the insurer (*i.e.*, in favor of coverage), *see id.*; *Trotter v. Harleysville Ins. Co.*, 821 F.3d 916, 918 (7th Cir. 2016) (citing *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 223 Ill.2d 407, 860 N.E.2d 280, 286 (2006)); *see also Cincinnati Ins. Co. v. Vita Food Prods., Inc.*, 808 F.3d 702, 704 (7th Cir. 2015) (applying Illinois law).

#### 1.  The Pollution Exclusion

Appended to Double D's insurance policy was an endorsement excluding from coverage any "loss or damage caused by [or] resulting from [the] release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS," where "CONTAMINANTS or POLLUTANTS" included "any solid, liquid, gaseous or thermal irritant or contaminant, including . . . vapor, . . . fumes [and] chemicals . . . , which after its release . . . causes . . . damage . . . to property insured

[under the policy]." [96-2] at 18. Because PQ alleges that its property was damaged by chemical vapors, Lexington argues that this loss falls squarely within the pollution exclusion, and, consequently, that the insurance company was right to deny coverage in this case.

Lexington is correct that the exclusion, on its face, seemingly applies here. The formaldehyde vapors were "vapors," "fumes" or chemicals in "gaseous" form, and thus constituted "pollutants" (or "contaminants") as defined in the endorsement. But the Illinois courts have curbed significantly the reach of pollutions exclusions as a matter of public policy. In *American States Insurance Co. v. Koloms*, 177 Ill.2d 473 (1997), the Illinois Supreme Court examined the history of broadly-phrased (sometimes termed "absolute") pollution exclusions of the type at issue here, and observed that the insurance industry's primary motivation in drafting such exclusions was to avoid "the yawning extent of potential liability arising from the . . . discharge of hazardous substances *into the environment.*" *Id.* at 493 (citation omitted). Given this purpose, and the possibly absurd results that could follow if this purpose were ignored[3], the court thought it improper to extend the exclusion beyond injuries caused by "traditional environmental pollution." *Id.* at 484–94; *see also Scottsdale Indem. Co. v. Vill. of Crestwood*, 673 F.3d 715, 717–20

---

[3] Absurdities would result, for example, if absolute pollution exclusions were read to preclude coverage for one who slips and falls on the spilled contents of a household chemical, or for allergic reactions to chlorine in a public pool. *See Koloms*, 177 Ill.2d at 484 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)); *see also Scottsdale Indem. Co. v. Vill. of Crestwood*, 673 F.3d 715, 717 (7th Cir. 2012) (observing that it would be absurd to argue that accidents of this type fell within a pollution exclusion, "since in no reasonable sense of the word . . . was the [injured] a victim of pollution.") (applying Illinois law).

(7th Cir. 2012) (discussing *Koloms*). The Illinois Supreme Court did not define "traditional environmental pollution," but the lower courts in Illinois have since understood the phrase to mean hazardous material that is discharged into the land, atmosphere, or water. *Village of Crestwood v. Ironshore Specialty Ins. Co.*, 986 N.E.2d 678, 686 (Ill. App. Ct. 2013); *Connecticut Specialty Ins. Co. v. Loop Paper Recycling, Inc.*, 356 Ill.App.3d 67, 81 (1st Dist. 2005); *see also id.* at 82 ("[F]or there to be traditional environmental pollution, . . . the pollutant must actually spill beyond the insured's premises and into the environment.").

Lexington points to no evidence that the formaldehyde vapors PQ believes contaminated its products ever escaped into the land, atmosphere, or water around the Double D facility. The damage, as far as may be gleaned from the record, was contained to the warehouse itself. This was not "traditional" pollution under Illinois law, and so falls outside the bounds of the pollution exclusion here.

Citing *Kim v. State Farm Fire & Casualty Co.*, 312 Ill.App.3d 770 (1st Dist. 2000), Lexington argues that even intra-premises pollution or contamination may constitute pollution in the "traditional" sense. But the spill at issue in *Kim* included a release of chemicals into the soil beneath the property. *See id.* at 772. Applying the traditional-pollution standard described in *Koloms*, the Illinois appellate court concluded that the exclusion applied to the chemical spill at issue (under both sections of the relevant insurance policy[4]), because the spill was not confined to the

---

[4] In concluding that the exclusion to the property-damage section applied, the *Kim* court referenced its earlier discussion of the exclusion to the business-liability section. *See* 312 Ill.App.3d at 778.

cleaning company's building: the spill had also migrated to the land underneath. *See id.* at 775–78; *see also Crestwood*, 986 N.E.2d at 686 (discussing the holding in *Kim*); *Loop Paper*, 356 Ill.App.3d at 80–81 (same). There was no such a migration here.

Lexington argues that *Koloms* and its progeny in any event do not apply to the present suit, because this action involves a first-party insurance policy, whereas *Koloms*, etc., addressed only third-party policies. First-party insurance policies are agreements between the insurer and the insured (*i.e.*, the "first" party), to protect the insured from its own losses; third-party insurance, by contrast, protects the insured from losses arising from its liability to other ("third") parties. *See* 14 Couch on Insurance § 198:3 (2016); *Illinois Tool Works, Inc. v. Commerce & Industry Ins. Co.*, 962 N.E.2d 1042, 1053–54 (Ill. App. Ct. 2011). The relevant portion of the "Warehouse Legal Liability Policy" issued to Double D provided third-party coverage: it required Lexington to indemnify Double D for losses the warehouse operator incurred as a result of liability to its customers. The "traditional pollution" limitation therefore applies to the present endorsement.

But if the limitation applied, says Lexington, the endorsement would be meaningless. *See, e.g.*, *Pekin Ins. Co. v. Wilson*, 237 Ill.2d 446, 466 (2010) (insurance contracts should not be read in such a way as to render terms superfluous) (citation omitted). The endorsement explains that Double D's policy did not cover land, land values, or water, *see* [96-2] at 18; so if the exclusion were construed to apply only to pollution or contaminants that affected those things, argues Lexington, then in

10

practice there would be no exclusions at all. Not so. The policy affirmatively covered only Double D's liability for damage to others' personal property when stored in the warehouse (or on platforms, or in other areas, adjacent to the building), *see id.* at 6, 15 (Sections I.1, XIII.9). But damage to goods stored in the warehouse could have resulted, as in *Kim*, from contaminants that also escaped the building—in which case the exclusion would have been triggered. Or damage to the customer's property could have stemmed from pollutants that *entered* the warehouse from the land, water, or atmosphere outside; those losses, too, would have been excluded from coverage. Neither scenario occurred here.

The damage to PQ's property was not caused by pollution in the "traditional" sense. The pollution exclusion therefore does not apply under Illinois law, and Lexington was incorrect to deny coverage on that basis.

### 2. *The Warehouse-Receipt Requirement*

Section II.4 of Double D's insurance contract provided that Lexington would not cover losses or damage to property held by Double D if Double D did not: "obtain a signed warehouse receipt from the customer at the time the customer deposited [its] property" with Double D; "obtain a signed storage agreement from the customer covering the . . . property"; or "present a rate quotation prior to receiving the . . . property." [96-2] at 7 (internal quotation marks omitted). PQ, as Double D's assignee, argues that Double D complied with the requirements of Section II.4—and thus the damage to PQ's property was covered under Lexington's policy—because Double D used two forms of "warehouse receipts" to keep track of the goods stored

11

in its warehouse: (1) bills of lading, issued in this case by PQ and transported by carrier[5] (along with the goods to be stored) to Double D, *see* Smith Deposition, [102-10] at 2–3, Tr. at 48:2–49:15; and (2) an online inventory-tracking system, which allowed depositors of goods into the warehouse (such as PQ) to view, by lot number, any goods received, or subsequently shipped out, by Double D; *see* Smith Deposition, [96-11] at 6, Tr. at 50:8–:19; September 17, 2014 Deposition of Steven Olsen, [97-6] at 51, Tr. at 190:4–192:13 (explaining that information was uploaded into the system from bills of lading). The term "warehouse receipt" was not defined explicitly in Double D's insurance contract with Lexington, but is commonly understood to mean a receipt, evidencing title to goods in storage, issued by the person or entity engaged in the business of storing those goods. *See* 810 ILCS 5/1-201(b)(27), (42) (Illinois Uniform Commercial Code); Merriam-Webster Online Dictionary, http://www.merriam-webster.com/legal/ warehouse%20receipt (last visited July 28, 2016).

PQ's bills of lading were not warehouse receipts. Though bills of lading may constitute documents of title, *see* 810 ILCS 5/1-201(b)(16), the bills here were issued by the customer (PQ), not the entity engaged in the business of storing customers' property (Double D). Whether Double D's online tracking system functioned as a warehouse receipt is a closer question—as Double D generated the system and its contents, and thus could be said to have "issued" any evidence of title to the goods

---

[5] The carrier was Double D Express, a separate entity from Double D Warehouse. *See* [101-1] at 5 ¶¶ 17–18; [102-1] at 8–9 ¶¶ 13–14.

described therein[6]—but the question is ultimately immaterial, because there is no indication that PQ ever signed this "receipt." Double D's insurance policy covered damage to a customer's property only if the warehouse obtained from the customer "a *signed* warehouse receipt . . . at the time the customer deposited [its] property with [Double D]." [96-2] at 7 (Section II.4(A)) (emphasis added) (internal quotation marks omitted). PQ signed the bills of lading, *see* Smith Deposition, [102-10] at 2, Tr. at 48:15–:23; [102-11] at 2–3 (sample bills), but these, as just explained, were not warehouse receipts; and there is no indication that PQ signed its name, whether literally or electronically, to any tracking report at the time of deposit. PQ's property was not covered under the insurance contract with Lexington, because Double D did not comply with Section II.4 of that agreement.

PQ argues that Double D necessarily complied with Section II.4, as the warehouse operator disclosed in its insurance application that it would be using bills of lading as warehouse receipts. So Lexington, according to PQ, was aware of Double D's business processes before Lexington issued the policy, and cannot now deny coverage based on those processes. Lexington's knowledge is irrelevant to whether Double D in fact satisfied its contractual obligations—Double D either met those obligations or it did not (and in this case it did not). However, if Lexington knew that Double D's processes would not satisfy the requirements of Section II.4,

---

[6] Warehouse receipts need not be tangible documents. *See* 810 ILCS 5/7-202(a) (explaining that no particular form of warehouse receipt is required); *cf.* 7 U.S.C. § 250(e)(2) (permitting the use of electronic receipts under the United States Warehouse Act); 810 ILCS 5/7-302 cmt. 2 (contemplating that "combination" electronic documents, which include information necessary for both the transportation and storage of goods, may come into use).

but issued the policy anyway, Lexington may have waived those particular requirements. *Cf. State Farm Mut. Auto. Ins. Co. v. Burke*, 51 N.E.3d 1082, 1099–1101 (Ill. App. Ct. 2016) (finding waiver of certain policy defenses where insurer granted coverage despite its knowledge of the ability to invoke those defenses).

To waive a requirement of an insurance contract, the insurer must intentionally relinquish a known right. *Id.* at 1099; *Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1233 (7th Cir. 1994) (citing *Western Cas. & Surety Co. v. Brochu*, 105 Ill.2d 486, 498 (1985); *Florsheim v. Travelers Indem. Co.*, 75 Ill.App.3d 298, 304 (1st Dist. 1979)). Such a relinquishment may be express or implied, and occurs where the insurer's words, conduct, or knowledge is "inconsistent with the intention to rely on the requirements of the policy." *Anetsberger*, 14 F.3d at 1233 (quoting *Ames v. Crown Life Ins. Co.*, 85 Ill.App.3d 203, 204–05 (3d Dist. 1980)); *Brochu*, 105 Ill.2d at 499. Whether the facts are sufficient to constitute a waiver is a question of law. *Anetsberger*, 14 F.3d at 1233 (citations omitted).

PQ relies on Double D's original insurance application to establish a waiver in this case. The application was submitted in 2008 through Double D's insurance agent, *see* [99] at 1 ¶ 2; [96-3], though who completed which parts of the application remains unclear. (The agent stated at his deposition that he answered only the first six of approximately thirty questions, but Double D's owner, who signed the application on behalf of the warehouse, claimed that he had not filled out any portion of the application. *See* Olsen Deposition, [97-6] at 15, Tr. at 47:8–:11; *id.* at 18, Tr. at 58:8–59:14; May 19, 2014 Deposition of Jeff Krzyaniak, [96-10] at 9, Tr. at

48:6–:18.) In any event, whoever completed the papers made a handwritten notation next to item 27, which instructed the applicant to "[a]ttach [to the application] a complete copy of the warehouse receipt used." [96-3] at 4. The notation next to item 27 included the word "contract," followed by a small space, then "delivered" (or "deliveries"—the handwriting is illegible at this point) "by bil laden [*sic*]." *Id.* PQ argues that this notation clearly communicated to Lexington that Double D was using bills of lading as its warehouse receipts. Viewed in context, however, the notation does not reasonably permit the inference that PQ urges.

The meaning of the notation itself is ambiguous. PQ suggests that it be read as single sentence: "Contract delivered by bil laden [*i.e.*, by bill of lading]." But this sentence doesn't make sense when read literally (bills of lading don't make deliveries). So PQ maintains that "delivered by"—here assuming that the notation indeed says "delivered by" and not "deliveries by"—in this case means "set forth in." The bills of lading, in other words, were functioning as contractual agreements. Except the sample agreement attached to the application was not a copy of a bill of lading; attached instead was an unsigned excerpt from a "contract and rate quotation" entitled "Standard Terms and Conditions for Merchandise Warehousemen." *Compare id.* at 11 (attachment to insurance application) *with* [102-11] (bills of lading actually received by Double D).

The underwriter assigned to Double D's application reviewed this "contract" and found in it what he thought was a limit on Double D's liability. *See* July 1, 2014 Deposition of Toby Petzel, [96-9] at 2–3, Tr. at 51:18–52:4; [101-3] at 16, Tr. at

187:19–:21. The inclusion of a(n assumed) liability limitation was in this case important, because the insurance policy at issue required Double D, in order for goods stored at its warehouse to be covered under the policy, to have presented to its customers a "rate quotation" (which, as explained in the policy, necessarily included a loss limitation) or, if not a rate quotation, then a "warehouse receipt" or "storage agreement." [96-2] at 7, 15. "Storage agreement" was not defined in the policy, *id.*, but the underwriter understood it to mean essentially the same thing as a rate quotation, in that both included liability limitations, *see* Petzel Deposition, [101-3] at 12, Tr. at 107:17–:21; *see also* [96-9] at 4, Tr. at 54:2–:3 ("We require a copy of the contract . . . because it limits the company's liability."); [101-3] at 17, Tr. at 219:7–:20 (similar).

Thus, the evidence reasonably suggests that Lexington approved Double D's insurance application because Lexington thought the warehouse *was* complying with the requirements of Section II.4—specifically, through the use of storage agreements. As it turned out, Double D did not employ agreements of the type attached to its application (and Double D's owner wasn't sure why the excerpt had been attached to the insurance application in the first place, *see* Olsen Deposition, [97-6] at 18, Tr. at 58:8–59:7).[7] But there is no indication that Lexington knew this, either when it initially issued the policy to Double D in 2008, or when it renewed

[7] PQ disputes that the document attached to Double D's insurance application was an actual warehouse agreement, because the document was incomplete and unsigned. *See* [101-1] at 15 ¶ 50; [102-1] at 1–2 ¶ 1. The question here is not whether the attachment to Double D's application constituted a legally enforceable warehouse contract, but whether Lexington *believed* the sample document, if properly executed by Double D's customers, would constitute a "storage agreement" that satisfied Section II.4 of the insurance policy.

the policy in subsequent years.[8] There is thus no evidence that Lexington acted inconsistently with any intention to rely on the requirements of Section II.4 of the policy, or, consequently, that Lexington waived its right to later rely on those requirements in denying coverage. The damage to PQ's inventory was properly excluded from coverage under the policy because of Double D's failure to comply with Section II.4 of that agreement.

### 3. The Written-Consent Provision

Lexington argues next that it is entitled to summary judgment under the policy's written-consent provision. Though the insurance company is otherwise entitled to judgment under Section II.4, as just discussed, for completeness, I also address Lexington's argument that the written-consent provision was likewise violated.

In executing the insurance agreement with Lexington, Double D made certain commitments in the event of a loss. Among these was a promise not to "voluntarily make a payment, assume any obligation, admit any liability, or incur

---

[8] The underwriter on Double D's policy changed sometime before the policy was renewed in 2011. The second underwriter testified at his deposition that, in underwriting the 2011 renewal, he reviewed and relied on (as evidence that a warehouse contract was being used) the contract excerpt attached to Double D's initial application from 2008. *See* September 10, 2014 Deposition of Chad Zomek, [97-35] at 20, Tr. at 66:1–:5; *id.* at 21–22, Tr. at 73:8– 74:20, 76:12–77:9; *id.* at 37, Tr. at 136:4–137:2; *id.* at 43, Tr. at 159:20–160:17; [97-34] at 11. PQ objects to Lexington's reliance on Zomek's deposition testimony, arguing that Zomek cannot offer lay-opinion testimony on an "ultimate issue." *See* [101-1] at 15–16 ¶ 51; [102-1] at 2–3 ¶ 3. But this objection misunderstands the question at hand, as explained above in note 7. Relying on portions of Zomek's deposition testimony, PQ also suggests that the second underwriter never actually saw the excerpt just discussed. *See* [102] at 2; [102-1] at 2–3 ¶ 3. PQ takes this testimony out of context, however. Read as a whole, Zomek's testimony clearly indicates that he recalled having seen and relied on the document at issue.

any expense . . . without [Lexington's] written consent," except at Double D's own cost. [96-2] at 13 (Section X.1(F)). Lexington argues that Double D breached this provision of the contract, thus relieving Double D of its duty to indemnify, when Double D settled its claim with PQ without first notifying Lexington or obtaining its authorization. Lexington also contends that PQ, which now stands Double D's shoes, breached this same provision when PQ settled a claim with one of its own customers.

PQ could not have breached the insurance agreement by settling with one of its customers, because PQ was not then a party to the contract. In October 2011, one of PQ's customers notified PQ of problems with the customer's own products, which had been manufactured with the allegedly-contaminated silicates stored at Double D's warehouse. *See* [101-1] at 7–8 ¶ 13. The customer claimed that its own products were now contaminated, too, and could not be sold, *see id.*, so PQ agreed to settle that claim, and began making payments to the customer in January 2012, *see id.* at 8 ¶¶ 26–28. Lexington argues that, because PQ settled this claim without Lexington's prior approval, PQ cannot now recover the corresponding voluntary payments. But Lexington is conflating PQ's obligations with Double D's. The insurer is correct that, as Double D's assignee, PQ now stands in the former's shoes and is therefore "subject to all policy defenses [Lexington] could have asserted against its insured." *Central Mut. Ins. Co. v. Tracy's Treasures, Inc.*, 19 N.E.3d 1100, 1122 (Ill. App. Ct. 2014) (citation omitted). This means that PQ cannot avoid the consequences of *Double D*'s pre-assignment conduct; it does not mean that

Double D's pre-assignment obligations retroactively apply to PQ. In 2012, PQ was free to settle claims with and make payments to its customers as it pleased.

There is, however, an issue with Double D's settlement with PQ. The insurance contract makes clear that, except at its own cost, Double D could not admit any liability without Lexington's written consent. Yet that is exactly what Double D did in exchange for assigning to PQ the warehouse's claims and rights against Lexington. *See* Covenant Not to Execute and Stipulation for Consent Judgment, [97-30] at 7 ("[Double D] bears one hundred percent . . . of the fault for PQ's damages."). Pointing to *Davis v. United Fire & Casualty Co.*, 81 Ill.App.3d 220 (3d Dist. 1980), PQ argues that the admission of liability in this case wasn't problematic. But that is not quite right. In *Davis*, a default judgment was entered against the insured following a car accident. The insured then sued his insurance company after the latter refused to satisfy the judgment. The Illinois Court of Appeals concluded that the insurer was equitably estopped from arguing a breach of contract based on the insured's failure to notify the company of the third-party litigation, because the insured had notified its insurer of the accident, and the insurer had "flatly den[ied] coverage"—such that the insured "may well have considered any further communication with the company futile." *Id.* at 225–26.

There was no such suggestion of futility here. In its letters denying coverage to Double D, Lexington wrote:

> Should you have any other information you feel may be applicable or relevant to this matter, *please immediately forward it to [our] attention.* Please be advised that *Lexington will review any additional information submitted* under a full reservation of rights under the

Policy and at law, including the right to request additional documentation.

[96-21] at 4 (emphases added); *see also* [96-22] at 5 (same).[9] No reasonable juror would conclude from this message that further communications with Lexington would have been pointless. This was not, in short, the kind of blanket denial of coverage that relieved Double D of its contractual obligations under the policy. Double D then breached one of those obligations in admitting liability to PQ. As Double D's assignee, PQ cannot recover under the policy for the damage to its property while stored at the warehouse.

For the reasons discussed above, Lexington's motion for summary judgment on Counts I and II of the complaint (declaratory judgment of coverage, and breach of contract, respectively) is therefore granted. PQ's cross-motion on those counts is denied.

### B.    Sanctions Under Section 155

PQ asserts that Lexington failed to adequately investigate the insurance claim in this case, and denied coverage based on unreasonable interpretations of the policy provisions at issue. PQ accordingly seeks attorney fees and other compensation under Section 155 of the Illinois Insurance Code, 215 ILCS 5/1 *et seq*. Section 155 of the Code provides that, in "any action . . . against a[n insurance] company wherein there is in issue the liability of a company on a policy . . . or the

---

[9] PQ emphasizes that Lexington denied coverage not once, but twice. But the second denial letter issued only because of a mix-up concerning the date of loss (which affected which policy applied). Practically speaking, there was only a single claim for coverage, and a single denial of same.

amount of the loss payable thereunder," the court may award to the plaintiff reasonable attorney fees, other costs, and further monetary sanctions (not to exceed any of three specified amounts) where the insurer's refusal to recognize liability and pay a claim was "vexatious and unreasonable." 215 ILCS 5/155(1); *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1023 (7th Cir. 2013) (quoting *Cramer v. Ins. Exch. Agency*, 174 Ill.2d 513, 675 N.E.2d 897, 900 (1996)). Where there is a bona fide dispute regarding coverage, however, sanctions under Section 155 are inappropriate. *Phillips*, 714 F.3d at 1023 (quoting *Med. Protective Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir. 2007)).

Here there was more than a bona fide dispute, as Lexington was correct to deny coverage under Section II.4 of the insurance policy. Where Lexington erred was in applying the pollution exclusion; but Lexington's position on this front was not frivolous. The endorsement as written plainly excluded from coverage the damage to PQ's property, and this argument, if presented in another jurisdiction, may have carried the day. *See, e.g.*, *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 283 Va. 624, 636 (2012); *United States Fire Ins. Co. v. Ace Baking Co.*, 164 Wis.2d 499, 504–05 (1991); *see also Scudella v. Ill. Farmers Ins. Co.*, 174 Ill.App.3d 245, 253 (1st Dist. 1988) ("[D]enials [of coverage] based on a policy's express wording are inappropriate for invoking [Section 155].") (citations omitted). Lexington's arguments about the pollution endorsement were ultimately unpersuasive under Illinois law, but they were not so questionable as to warrant statutory sanctions.

Lexington's motion for summary judgment on Count III of the complaint is therefore granted, and PQ's corresponding cross-motion is denied.

## IV. Conclusion

Defendant's motion for summary judgment, [94], is granted. PQ's cross-motion for summary judgment, [96], is denied. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 7/29/16